**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No.: 21-CR-508 (2) (BAH)** |
| **LANDON BRYCE MITCHELL,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth below, the government requests that this Court sentence Landon Bryce Mitchell to 33 months of incarceration, at the top of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and a $180 special assessment.

## I.    INTRODUCTION

Landon Bryce Mitchell was one of the very few rioters who breached the Senate Chamber and ascended the Dais during his participation in the January 6, 2021 attack on the United States Capitol. That violent attack forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Mitchell planned for conflict in advance of January 6. Leading up to January 6, 2021, Mitchell made a number of posts on social media, including the following:

---

[1]    As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

- "If biden wins, civil war it shall be";

- "It[']s flat out treason what they're pulling and the law doesn't apply to them.  So we need to become the law";

- "when they invalidated my vote with all their cheating, they invalidated my consent to be governed by them!";

- "if we don't fight now there is no point in ever voting again"; and

- "Joe Biden IS NOT MY PRESIDENT . . . Better believe I'll be in DC Jan. 6th!  Whose [sic] coming with me?"

Then, on January 6, 2021 Mitchell and his co-defendant, Luke Wessley Bender, traveled together to the former President's "Stop the Steal" rally, marched to the Capitol, and made their way onto restricted Capitol grounds.  As they arrived near the Capitol Building, Mitchell and Bender paused for a picture.  As Mitchell explained later on January 6, Mitchell and Bender "climbed the scaffolding up 3 stories, pushed back the police and breached the doors!"  Mitchell stated in Facebook messages to his friends and family members that he "Breached the Capitol today," that he was "one [of] the very first in," and "one of the first to Breach."

Mitchell and Bender then unlawfully entered the Capitol building, went into the Rotunda, made their way down several hallways, and eventually walked into the Senate Chamber and onto the Senate Floor.  They remained on the Senate Floor together for approximately five minutes until a group of Capitol Police officers arrived and directed them to leave.  While on the Senate Floor, Mitchell and Bender leafed through and examined documents on Senators' desks, ascended the Senate Dais, and posed for pictures, including ones taken next to the self-proclaimed "QAnon Shaman," Jacob Chansley.  Among the attachments to Mitchell's Facebook messages include photographs and videos of Mitchell on the Senate Floor on January 6, 2021.

Following January 6, 2021, Mitchell continued voicing pride in his actions, including stating that: "The breach wasn[']t so much about Trump as it was about how much we the people are fed up with how our government is mistreating us and lying to us[,]" and "This election was rigged, blatantly.  And here they sit laughing at us, the citizens, thinking we won[']t do anything about it but take it.  Wrong."  On January 31, 2021, he stated on Facebook that "the people who breached the capitol were heroes and patriots."

The government recommends that the Court sentence Mitchell to 33 months of incarceration for violating 18 U.S.C. § 1512(c)(2), a sentence which is at the top of the advisory Guidelines' range of 27 to 33 months, which the government contends is the correct Guidelines calculation.  A 33-month sentence recognizes Mitchell's admission of the facts supporting his conviction but also reflects the gravity of his conduct on January 6, 2021 and his criminal history (including numerous violations of the terms of pretrial release).  It also is consistent with the government's high-end Guidelines recommendation as to his co-defendant, Luke Bender.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 95 at 3-5, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, which was intended to, and temporarily did, disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Landon Bryce Mitchell's Role in the January 6, 2021 Attack on the Capitol

#### *Conduct Leading Up to January 6, 2021*

On January 6, 2021, Mitchell lived in Arlington, Virginia.  Prior to January 6, 2021, Mitchell posted various images and videos on his social media accounts showing his belief that

the 2020 Presidential election was "stolen" from then-President Donald J. Trump.

On December 11, 2020, Mitchell shared on his Facebook account a news article about the possibility of some states seceding from the Union with the comment, "I'm down for it.  If biden wins, civil war it shall be[.]"



*Image 1: Screenshot of Facebook Post from Dec. 11, 2020 (Ex. 4.1)*

On December 18, 2020, Mitchell wrote, "It[']s flat out treason what they're pulling and the law doesn't apply to them.  So we need to become the law."  Ex. 4.2.  On December 26, 2020, Mitchell posted a Facebook meme that stated, "when they invalidated my vote with all their cheating, they invalidated my consent to be governed by them!"



*Image 2: Screenshot of Facebook Post from Dec. 26, 2020 (Ex. 4.3)*

On December 27, 2020, Mitchell posted a Facebook meme that stated, "if we don't fight now there is no point in ever voting again." The post included an individual in Revolutionary War clothing, wearing a scarf over the lower part of his face, in front of the U.S. Capitol Building.



*Image 3: Screenshot of Facebook Meme from Dec. 27, 2020 (Ex. 4.4)*

On December 30, 2020, Mitchell posted to a Facebook page titled "Joe Biden IS NOT MY PRESIDENT," the statement, "Mornin' y'all.  From Texas, currently living in VA.  Better believe I'll be in DC Jan. 6th!  Whose [sic] coming with me?"  Ex. 4.5.

### Approach to the Capitol

On the morning of January 6, 2021 Mitchell traveled to Washington, D.C. with his co-defendant, Luke Wessley Bender, via Metro train from Arlington, Virginia.  Mitchell and Bender attended the "Stop the Steal" rally at the Ellipse.  Mitchell wore a red baseball cap and carried a large flag.  The hat and flag both bore the name of former President Trump.



*Image 4: Open Source Photo from Jan. 5, 2021 (Ex. 2.1)*

Mitchell and Bender and then marched with other protestors to the Capitol grounds.



*Image 5: Image from Jan. 6, 2021 (Ex. 2.2)*



*Image 6: Image from Jan. 6, 2021 (Ex. 2.3)*

As they arrived near the Capitol Building, Mitchell and Bender paused for a picture, which

Bender later shared on his TikTok account, accompanied by a song entitled, "Go to War."





*Images 7, 8: Screenshot of Bender's TikTok Video from Jan. 6, 2021 (Ex. 4.9) and*
*Photo Taken at About the Same Time*

### *Mitchell Ascends the Scaffolding*

Mitchell and Bender then climbed up scaffolding that had been erected for the inauguration of President Biden.  *See Ex. 3.2 at 10:40, 11:09.*  Bender took a cell phone video that captured an image of Mitchell on the scaffolding, the rioters beneath him, and police officers attempting to defend the Capitol Building using pepper spray.



*Image 9: Screenshot of Bender's TikTok Video from Jan. 6, 2021 (Ex. 5.9)*

### *Mitchell Enters and Makes His Way Around the Capitol Building*

At about 2:45 p.m., Mitchell and Bender unlawfully entered the U.S. Capitol Building through the Upper West Terrace Door.  Mitchell wore a camouflage gaiter over the lower portion of his face during his entire time inside the Capitol Building.  A vastly outnumbered group of USCP officers retreated from defending the door less than a minute earlier.



*Image 10: Screenshot of CCTV Video from Jan. 6, 2021 (Ex. 1.1)*

Bender recorded part of his and Mitchell's journey, including their entry into Capitol Building and the Rotunda.  *See* Ex. 4.13, 5.12.  In one of those videos, the alarm to the Upper West Terrace Door can be heard, and Mitchell's fellow rioters loudly chant, "Whose house? Our House!"  Ex. 5.12.  In the video, Bender exclaimed, "Right now, we're inside the Capitol. We just stormed the gates!"  Ex. 5.13.

Mitchell and Bender then proceeded through the Rotunda, down the East Front Corridor, through the Ohio Clock Corridor, down a hall, and into the Senate Chamber.  The government estimates that fewer than 70 people entered the Senate Floor on January 6, 2021.







*Images 11, 12, 13: Screenshots of CCTV Videos from Jan. 6, 2021 (Ex. 1.3, 1.4, 1.5)*

### *Mitchell Enters the Senate Floor*

Mitchell and Bender entered the Senate Floor at approximately 3:04 p.m.



*Image 14: Screenshot of CCTV Video from Jan. 6, 2021 (Ex. 1.9)*

While on the Senate Floor, Mitchell and his co-defendant reviewed documents that were sitting on tables.



*Image 15: Screenshot of CCTV Video from Jan. 6, 2021 (Ex. 1.9)*

Mitchell and Bender also took "selfies" from the Senate Floor.



*Image 16: Cell Phone Image from Jan. 6, 2021 (Ex. 5.14, 5.15)*

Mitchell then ascended to the Senate Dais and posed for pictures with fellow rioter Jacob

Chansley.  Mitchell and Bender were among the very few rioters to go to the top level of the Dais.



*Image 17:  Screenshot of CCTV Video from*
*Jan. 6, 2021 (Ex 1.10)*



*Image 18: Cell Phone Image from Jan. 6, 2021 (Ex 5.16)*

At approximately 3:08 p.m., USCP officers entered the Senate Floor and directed Mitchell, Bender, and other individuals to leave the Chamber.



*Image 19: Screenshot of CCTV Video from Jan. 6, 2021 (Ex 1.10)*

14

Mitchell and Bender left the U.S. Capitol through the Senate Carriage Door at approximately 3:10 p.m.  *See* Ex. 1.12, 1.13, 1.14, 1.15, 1.16, 1.17.

Later on January 6, 2021, Mitchell stated in Facebook messages to his friends and family members that he "Breached the Capitol today," that he was "one [of] the very first in," "one of the first to Breach," and "climbed the scaffolding up 3 stories, pushed back the police and breached the doors!!" Among the attachments to Mitchell's Facebook messages include photographs and videos of Mitchell on the Senate Floor on January 6, 2021.  *See* Ex. 4.15, 4.16, 4.17, 4.18, 4.19, 4.20.

In one of his messages on January 6, 2021, Mitchell explained, "Yea, people are fed up with how crooked the government has been and they pretty much been laughing at us thinking we wouldn[']t do anything about it." Ex. 4.16.

On January 7, 2021, Mitchell posted on Facebook an image of a skull surrounded by red smoke, with the caption, "Absolutely proud of my fellow Americans who made their voices heard at the Capitol."



*Image 20: Facebook Post from Jan. 7, 2021 (Ex 4.12)*

On January 10, 2021, Mitchell commented on a post from January 9, 2021. He stated, "The government calls us traitors and terrorists. They seem to forget that this country was made on rebellion against the 'legal' government." Mitchell also stated, "The breach wasn[']t so much about Trump as it was about how much we the people are fed up with how our government is mistreating us and lying to us[,]" and "This election was rigged, blatantly. And here they sit laughing at us, the citizens, thinking we won[']t do anything about it but take it. Wrong." Ex. 4.23. Reflecting upon the fact that he had not been arrested by January 17, 2021, Mitchell joked to a friend, "Ha! Nah I'm invincible." *See* ECF No. 1-1 at 10.

On January 31, 2021, Mitchell replied to an individual's comment on a post from January 30, 2021. He stated that, "the people who breached the capitol were heroes and patriots." Mitchell also argued that former President Trump did not tell his supporters to storm the Capitol. Ex. 4.24.

On February 10, 2021, Mitchell re-posted an image on Facebook of individuals surrounding a vehicle accompanied by a statement, "they want you to forget about this summer." Mitchell included his own comment with the re-post, stating, "and yet the patriotic capitol breach was seen as a terroristic action (by the scum in congress, not by any true American)." Ex. 4.26.

### *Mitchell's Statements*

On October 20, 2021, the Federal Bureau of Investigation ("FBI") interviewed Mitchell, who admitted that he climbed the scaffolding, entered the Capitol Building, and entered the Senate Chamber on January 6, 2021. He explained that he believed that the individuals who entered the Capitol on January 6 did not "go too far" because, "it is our constitutional right, when we are being run by tyrants, to try to do something about it. I don't think what we did was wrong because I feel like they are overreaching[.]" Ex. 3.2 at 56:45. Explaining his actions, Mitchell told FBI that "If I feel like I'm being trampled on, it's my duty to stick up for other people, too." *Id.* at 58:05.

## III.     THE CHARGES AND STIPULATED TRIAL

On December 8, 2021, a federal grand jury returned an Indictment charging Mitchell with six counts: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One); Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). *See* 1:21-cr-00717-BAH, ECF No. 18.

On, December 7, 2022, Mitchell was convicted of those offenses after a stipulated trial. He admitted an extensive factual basis that supported his conviction. *See* ECF No. 95.

## IV.     STATUTORY PENALTIES

Mitchell now faces sentencing on all six counts in his Indictment.  As noted by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years on Count One; one year each on Counts Two and Three; and six months each on Counts Four, Five, and Six.  PSI ¶¶ 143-145.

The maximum terms of supervised release are three years for Count One and one year for Counts Two and Three.  PSI ¶¶ 151-152.  The maximum fine is $250,000 for Count One; $100,000 for Counts Two and Three; and $5,000 for Counts Four through Six.  PSI ¶¶ 175-177.  Mandatory special assessments total $180.  PSI ¶¶ 178-180.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable

Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

While the government agrees with the sentencing range calculated by the Probation Office, the PSI does not include a Guidelines analysis for each of the counts to which Mitchell pleaded guilty.  *See* PSI ¶¶ 70-79.  Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments.  Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.  The PSI does not follow these steps, concluding that Counts One, Two and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).  *See* PSI ¶ 69.

A full Guidelines analysis follows:

> *Count One: Obstruction of an Official Proceeding, in violation of 18 U.S.C.*
> *§ 1512(c)(2).*

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Special offense characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |

| | | |
|---|---|---|
| | | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Total | 17 | |

*Count Two: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).*

| | | |
|---|---|---|
| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 17 (from Count One) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Mitchell entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count One, and the base offense level for that offense should be applied. |
| Total | 17 | |

*Count Three: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).*

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Total | 10 | |

*Counts 4, 5, and 6: Entering and Remaining on the Floor of Congress, 40 U.S.C. § 5104(e)(2)(A); Disorderly conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).*

| Base Offense Level | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply to them.  *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |
|---|---|---|

### *Adjustments*

Mitchell argues that the specific offense characteristic ("SOC") set forth in U.S.S.G. § 2J1.2 is inapplicable to his conduct in this case pursuant to Judge McFadden's holding in *United States v. Seefried*, No. 21-cr-287(2) (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022).  The Government respectfully disagrees with the analysis in that case and believes that the SOC applies.[2]

---

[2] Should the Court decline to apply this adjustment, the Government will seek an upward variance. *See United States v. Rubenacker,* No. 21-cr-193, Sentencing Tr. at 60-81 ("So even if defendant were correct – which he is not – that the SOCs in the guideline 2J1.2 did not cover congressional proceedings, … these SOCs capture specific harms warranting an increase in sentence severity … and warrant corresponding increases in the severity of the sentence by way of a departure or a variance"); *see also United States v. Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 36 ("it seems like it would lead to unwarranted sentencing disparities to apply [§ 2J1.2] … in only cases involving what we classically think of as administration of justice."); *id.* at 36-37 ("Even if I took the sort of plain language approach and did what you're suggesting, why wouldn't I, under 3553(a), enhance his sentence in a commensurate amount based on these enhancements?  Why wouldn't I, by analogy, get to the same place under 3553(a)?").

U.S.S.G. § 2J1.2, which applies to "Obstruction of Justice" offenses, provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).  This Court and many of its colleagues have almost uniformly applied that enhancement in cases involving a conviction under 18 U.S.C. § 1512(c)(2).  *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 60-81 (Howell, C.J.); *accord*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003 (Lamberth, J.); *United States v. Miller*, No. 21-cr-075 (Moss, J.); *United States v. Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt*, No. 21-cr-23 (Kelly, J.); *United States v. Robertson*, 21-cr-34 (Cooper, J.).

*First*, neither dictionary definitions nor usage analysis dictate that the term "administration of justice" be limited to a judicial or quasi-judicial proceeding.  *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 62-63.  Judge McFadden was correct to note that that the Black's Law Dictionary definitions of "administration of justice" and "due administration of justice" "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights," *Seefried*, 2022 WL 16528415 at *2. However, Black's Law Dictionary also contains broader definitions of "justice" and "obstruction of justice," which relate to the orderly administration of the law more generally.  *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 71-72.  For example, Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see also* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").  Indeed, Black's Law

Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice."  Black's Law Dictionary (11th ed. 2019) (emphasis added).

Similarly, while the *Seefried* Court's survey of uses of the term "administration of justice" in legal usage does suggest that the phrase is frequently (and perhaps predominantly) used to refer to "a judicial proceeding deciding legal rights," and to lesser extent, to "law enforcement activities," *Seefried*, 2022 WL 16528415, *5-*7,  the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the Guideline's context, purpose, and commentary point in a different direction.  Like all words, legal terms often bear multiple meanings.  For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense.  Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus.  And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and its commentary.  *See* U.S.S.G. § 2J1.2 cmt. n.1 (defining "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*") (emphasis added).

*Second*, Section 2J1.2's inclusion of definitions in the Commentary that undoubtedly relate to "investigations, verdicts, and judicial determinations" does not support a definition that excludes congressional proceedings.  The Commentary's use of the word "includes" indicates that the

definition is not an exhaustive list.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).  As Judge Friedrich explained,

> I also think Part J generally refers to the administration of justice, and I don't think that we can infer simply because the Commission didn't include the phrase, 'official proceeding of Congress,' that it meant for that type of offense prosecuted under Section 1512(c)(2) to not be subject to the same aggravating factors that the Commission has delineated here.

*Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 37-38.  And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Nor does reading the Commentary's use of the word "governmental . . . resources"[3] to include congressional resources would not "render[ ] the phrase 'or court' superfluous."  *Seefried*, ECF No. 123 at 17.  Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is not a superfluity.  The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts.  And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial).  The superfluity canon provides no basis to limit the term to

---

[3] The government's position that the events of January 6, 2021 caused the unnecessary expenditure of substantial governmental or court resources is based not on the number of defendants charged or prosecutions commenced, but on extensive expenditure of government resources in an effort to quell the breach – including the deployment of the USCP, the Metropolitan Police Department ("MPD"), the National Guard, and various other state and federal law enforcement agencies – and to clean up and repair the damage done to the Capitol building and grounds by the rioters. *Compare Seefried*, 2022 WL 16528415  at \*8-9, *with Seefried*, Gov't Sentencing Memo, ECF No. 115 at 29; *see also Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 39 ("there's no question that this costs the government a lot to respond with law enforcement officers and the delay in the vote, keeping members of Congress there late into the night to finish their job[.]").  The enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.

"*prosecutorial* resources." *Id.*  Indeed, if the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous.

*Third*, there is no conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice."  The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011).  And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently.  First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources.  Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice."  And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

*Fourth*, the application of subsections (b)(1)(B) and (b)(2) only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature itself creates line drawing problems.  Those descriptors themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations."  *Seefried*, ECF No. 123 at 1.  For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress.  That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4.  The government's broader reading of "administration of justice," by contrast,

would apply to all the obstruction offenses covered by § 2J1.2.  Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

The government agrees that Mitchell has demonstrated acceptance of responsibility for the offense, and that a three-level reduction under Guidelines Section 3E1.1 is appropriate.  PSI ¶¶ 77-78.  With these adjustments, Mitchell's total offense level is 14.  PSI ¶ 79.

### *Criminal History Category*

The U.S. Probation Office correctly calculated Mitchell's criminal history as Category IV based on six prior convictions, which resulted in six criminal history points.  PSI ¶ 80-86.  With a three-point adjustment for acceptance of responsibility, U.S. Probation calculated Mitchell's Guidelines range as 27 to 33 months of incarceration, which is the range that the government estimated in its submission to the Court.  *See* U.S.S.G. Ch. 5, Pt. A; ECF No. 83 at 1 n.3.

### VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a).  As described below, the Section 3553(a) factors weigh in favor of a sentence of incarceration at the high end of the applicable Guidelines range.

### A.    Nature and Circumstances of the Offense

Mitchell's unlawful conduct on January 6, 2021 was part of a massive riot that delayed, and almost succeeded in preventing, the certification of the electoral college vote.  Leading up to January 6, Mitchell posted on social media about "civil war," accused individuals of "treason," and spoke of the need to "fight now[.]"  At the day's events, Mitchell was no mere spectator; in fact, he was one of the few rioters who breached the Senate Chamber, where he examined documents on Senators' desks.  Following the violent entry of a mob into the Capitol Building,

Mitchell himself ascended to the top of the Senate Dais, posing for "selfies" where the Vice President presides. The intent of rioters like Mitchell was to frustrate the peaceful transition of Presidential power and throw the United States into a constitutional crisis. Following those events, Mitchell celebrated his own unlawful conduct and that of others in social media posts and messages. The nature and circumstances Mitchell's offenses are of the utmost seriousness, and justify the government's recommended sentence of 33 months' imprisonment.

### B.  Mitchell's History and Characteristics

Mitchell's crimes on January 6, 2021 were not an isolated incident in an otherwise law-abiding life. They came, instead, after a number of other serious offenses and a decades-long history of violating his probation conditions for those crimes. *See* PSI ¶¶ 80-83. Probation reported that Mitchell has six prior convictions, resulting in six criminal history points:

- 2008 Receiving Stolen Property (sentencing info. unknown) (0 points) (PSI ¶ 80)
- 2008 Larceny (30 days jail, suspended) (0 points) (PSI ¶ 80)
- 2008 Criminal Street Gang Participation (48 months jail, 36 months suspended) (3 points) (PSI ¶ 81)
- 2010 False Identify Self to Law Enforcement (12 months jail, 11 months suspended) (0 points) (PSI ¶ 82)
- 2011 Burglary, Enter House to Commit Larceny (5 years' jail, 2 years suspended) (3 points) (PSI ¶ 83)
- 2011 Grand Larceny, Not from Person (5 years' jail, 2 years suspended, concurrent with above) (PSI ¶ 83)

Mitchell was found to have committed numerous violations of his probation related to those crimes, *see* PSI ¶¶ 81, 83, and was still under supervision on January 6, 2021. PSI ¶ 85. Mitchell recently was charged with possession of methamphetamine in connection with a traffic stop that occurred in Conroe, Texas soon after he was permitted to relocate to Montgomery County, Texas to reside with his mother. PSI ¶¶ 9, 88a.

He has also repeatedly violated the Court's pretrial conditions in this case, resulting in five

Pretrial Violation Reports and Pretrial Services' repeated recommendation that Mitchell be removed from supervision and remanded into custody.  *See* PSI ¶¶ 7-19; *see also* ECF Nos. 41, 42, 73, 98, 101.  Most of these violations relate to Mitchell's abuse of controlled substances and refusals to comply with reporting, drug testing, and drug treatment requirements.  *See id.*  He violated his pretrial release conditions notwithstanding the Court's repeated admonitions that "Full compliance with pretrial release conditions is expected and demanded."  *See* ECF Entry, 11/8/2022; *see also* ECF Entries, 8/1/2022; 1/25/2023.

Mitchell's history and characteristics weigh in favor of a high-end Guidelines sentence.

## C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration.  When Mitchell made his way into the Capitol, through a fog of police pepper spray and as alarms blared, it was abundantly clear to him that lawmakers, and the police officers trying to protect them, were under siege by rioters.  Police officers were overwhelmed, outnumbered, and in some cases, in serious danger.  Mitchell directly added to that danger.  His decisions to join a mob to stop the certification of the election, to invade the Senate Chamber, to rifle through a Senator's documents, and to pose for photos on the Dais of the Senate show utter disrespect for Congress, democracy, and the rule of law.

---

[4]     FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

The government submits that this factor requires a sentence of imprisonment.  A lesser sentence would suggest to the public, in general, and other rioters, specifically, that crimes against police, and against Congress, are not taken seriously.  In this way, a lesser sentence could encourage further abuses.  *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B & C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

As this Court has explained, "[e]very defendant sentenced for their conduct on January 6th is in some ways – because of the general deterrence factor that all sentencing judges have to consider – … the scapegoats, the models for the punishment that can be meted out for anybody who engages in that kind of conduct."  *United States v. Mattice*, 21-cr-657 (BAH), Sentencing Tr. at 69.  And by posing on the Senate Dais, Mitchell made himself the embodiment of the rioters on January 6, 2021.

The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5]

---

[5]     *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

As the Court has explained, "the importance of deterring future malcontents disappointed with the outcome of an election from planning for and then disrupting the peaceful transition of power after an election … weighs very heavily[.]"  *United States v. Mattice*, 21-cr-657 (BAH), Sentencing Tr. at 70.  It is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.  Mitchell's criminal history shows that he has not been deterred by his previous interactions with the criminal justice system or even the charges here.  Reflecting upon the fact that he had not been arrested by January 17, 2021, Mitchell joked to a friend, "Ha!  Nah I'm invincible."  *See* ECF No. 1-1 at 10.  Mitchell sees himself as part of an existential battle against those who disagree with him, whose conduct he believes to be "treason."  Those who ransacked the Capitol to stop the certification of the 2020 election are "heroes and patriots" to Mitchell, while those who criticize the rioters are "scum."  Ex. 4.24, 4.26.  Mitchell's words and his actions demonstrate that he believes his crimes were justified because they were performed to advance his political goals.

Significantly, Mitchell has never expressed remorse for his conduct on January 6.  In fact, during his October 20, 2021 interview with the FBI, Mitchell explained that he believed that individuals who entered the U.S. Capitol on January 6 did not "go too far" because, "it is our constitutional right, when we are being run by tyrants, to try to do something about it.  I don't think what we did was wrong because I feel like they are overreaching[.]"  PSI ¶ 51.  Admitting the facts supporting his conviction is hardly the same thing as expressing remorse for one's unlawful

conduct.  *See* PSI ¶ 57 ("During the presentence interview, Defense counsel advised the defendant intends on making a statement regarding accepting responsibility at sentencing.  No additional information was provided.").  He has not acknowledged the damage done on January 6, 2021 or his own role.  Therefore, a high-end sentence reflects the need for Mitchell's sentence to be sufficient to provide specific deterrence from committing future crimes like these, while acknowledging his acceptance of responsibility.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range ordinarily will not result in an unwarranted disparity. *See United States v. Smocks*, 21-cr-198 (TSC), Sentencing Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when

warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government recommends a sentence at the top of the Guidelines range for both Mitchell and his co-defendant, Luke Bender. That is largely due to the identical nature of the defendants' conduct on January 6, 2021, as they traveled together to the rally, breached the Capitol Building together, and both invaded the Senate Floor, rifled through documents, ascended the Senate Dais, and posed for "selfies" where the Vice President presides. There are notable distinctions between Mitchell and his co-defendant, but those counterbalance. Mitchell has a higher criminal history category and repeatedly has violated the terms of his release, which justifies the three-month difference in the government's recommendations. But a high-end sentence is appropriate for Bender, as well, because Bender's criminal history appears to understate his actual criminal conduct due to the pendency of charges from a 2020 offense and the suspension of most

---

[6]    If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sentencing Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

of his prior criminal sentences.  As far as the government is aware, Mitchell engaged in more violent rhetoric and exhibited defiance in the face of these criminal charges, though Bender obstructed the investigation into his wrongdoing by deleting cell phone images and replacing his phone.  Such conduct could have entirely resulted in the denial of credit for his acceptance of responsibility.  In addition, Bender identified Mitchell during his interview and has expressed remorse for what he calls "stupid" conduct on January 6, 2021.  It should be noted that neither defendant actually has accepted responsibility by admitting guilt for the crimes charged.

Other than his co-defendant's, Mitchell's case is most analogous to that of January 6 defendant Christian Secor.  *See United States v. Secor,* 21-cr-00157-TNM.  Secor entered the Senate Wing door of the Capitol at 2:26 p.m., approximately 13 minutes after it was initially breached.  Like Mitchell, at approximately 2:48 p.m., Secor entered the Senate Floor, made his way to the Senate Dais, and sat in the seat that had been occupied by Vice President Mike Pence approximately 30 minutes earlier.  Also similar to Mitchell, Secor expressed pride in his actions in his post-January 6 texts and social media posts.  But Secor's conduct was more extensive than Mitchell's:  Secor served as the President of UCLA's "America First" Bruins organization, that espouses extreme political ideologies and is alleged to have coordinated some of the unlawful conduct that occurred at the Capitol on January 6, 2021.  Secor passed through House Speaker Nancy Pelosi's office and then joined and assisted a group of rioters inside the building to push against the East Rotunda doors, which were being guarded by three Capitol Police officers.  That group of rioters overpowered the officers, opened the doors, and assisted fellow rioters who entered the building.

Secor, in Criminal History Category I, faced a 51 to 63 month sentencing range, in part due to multiple potential enhancements for threatening injury or property damage.  Judge McFadden

disagreed that Secor's conduct was dangerous, but stated: "In short, I think your conduct on January 6th was extremely serious.  Your actions were about as blatant and obstructive as any I've seen from that day that do not involve actual violence against law enforcement."  Sentencing Tr. at 49.  Judge McFadden then granted a downward departure to 42 months of imprisonment.

Mitchell may also be compared to Jacob Chansley, a fellow rioter with whom Mitchell posed on the Dais.  *See United States v. Chansley*, 21-cr-3 (RCL).  Due to his unusual garb and face paint, Chansley was one of the most recognizable January 6 defendants.  Chansley was among the first rioters to enter the Capitol Building, walking through the Senate Wing Door at around 2:14 p.m.  He confronted police outside the Senate and carried a bullhorn to rile up the crowd.  Chansley entered the Senate Gallery and then entered the Chamber itself.  While there, Chansley occupied the Dais and took pictures with Mitchell, Bender, and others.  Although he had no prior convictions, Chansley faced a higher sentencing range than Mitchell – 41 to 51 months – because he received an enhancement for threatening to cause physical injury.  Chansley also demonstrated considerable acceptance of responsibility: on January 7, 2021, he called the FBI to identify himself, and drove to an FBI field office to continue his interview, at which time he was arrested. Chansley also was one of the first January 6 defendants to accept responsibility and plead guilty. Judge Lamberth issued a low-end Guidelines sentence of 41 months.

Another comparable case is *United States v. Hodgkins*, 21-cr-88-RDM.  Paul Hodgkins unlawfully entered the U.S. Capitol at around 2:50 p.m., carrying a backpack that had, among other items, protective eye goggles, rope, and white latex gloves.  Like Mitchell, by 3:00 p.m., Hodgkins made it to the floor of the Senate, where he took several selfies and stood near Jacob Chansley on the Dais.  Although both Mitchell and Hodgkins demonstrated acceptance of responsibility, Hodgkins pleaded guilty very soon after his arrest.  Indeed, Hodgkins was the first January 6

defendant to be sentenced for a violation of § 1512(c).  Unlike Mitchell, Hodgkins did not leaf through Senators' sensitive documents.  He also did not delete evidence.   Hodgkins, in criminal history category I, faced a 15-21 month sentencing range.  Judge Moss granted a downward departure to 8 months.

Mitchell's conduct has a number of similarities to that of Secor, Chansley, and Hodgkins: all three defendants, like Mitchell, made their way not only onto the Senate Floor, but also near or onto the Senate Dais.  However, the nature and circumstances of Mitchell's conduct and his history and characteristics are most like that of Secor, who Judge McFadden found to be nonviolent.  As Judge McFadden stated at Secor's sentencing, both defendants' decision to mount the Senate Dias "at the very time [former Vice President Pence] was supposed to be certifying the election showed a blatant disregard for the office of the Vice President and our system of government . . . That means you intended to obstruct the certification process occurring that day, a vital and solemn step in the peaceful transfer of power from one President to the next."  *United States v. Secor,* 21-cr-157 (TNM), Sentencing Tr. at 48.  Those actions, "[t]he sights we saw on January 6[th,] 2021, the crimes you and others committed on that day are things Americans never thought they'd see in the Capitol Building, and we certainly never hope to see them again."  *Id.*  Accordingly, a sentence of 33 months, at the top of Mitchell's Guidelines range, would not create any unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness

Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18

U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims

of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution

Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A),

"requires restitution in certain federal cases involving a subset of the crimes covered" in the

VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and

enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing

that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under

the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the

loss caused by the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 418 (1990)

(interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014)

(restitution under the MVRA limited to the "offense of conviction" under Hughey).[7]  Both require

identification of a victim, defined in both statutes as "a person directly and proximately harmed as

a result of" the offense of conviction.[8]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

§ 3663A(a)(2).  "In view of the purpose of the MVRA and the interpretation of the VWPA's

definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress

---

[7]      While both statutes generally limit restitution to losses resulting from conduct that is the
basis of the offense of conviction, they also authorize the court to impose restitution under the
terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United
States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at
*5 (D.N.J. Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[8]      The government or a governmental entity can be a "victim" for purposes of the VWPA and
MVRA.  *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations
omitted).

somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's

---

[9]     The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Mitchell's conduct in entering the Capitol building as part of a mob caused damage to that building.

losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[10]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d).  Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each

---

[10]    Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant's individual contribution to the victim's total losses.  18 U.S.C. § 3664(h).  That latter approach is appropriate here.

Specifically, the Court should require Mitchell to pay $2,000 in restitution for his convictions on Counts One through Six.  This amount fairly reflects Mitchell's role in the offense and the damages resulting from his conduct.  Moreover, in January 6 cases where the parties have entered into a guilty plea agreement, $2,000 consistently has been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.  Here, the government has no information to suggest that Mitchell was involved in specific property destruction.  Accordingly, such a restitution order avoids sentencing disparity with other January 6 defendants.

## VIII.   CONCLUSION

For the reasons stated above, the government recommends that the Court impose a sentence of 33 months of incarceration, three years of supervised release, $2,000 in restitution, and a $180 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
P.O. Box 55, Washington, D.C.  20044
Jordan.A.Konig@usdoj.gov
Tel.: 202-305-7917

_/s/ Samantha R. Miller_
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20001
Samantha.Miller@usdoj.gov