**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21-508-02 (BAH) |
| LANDON BRYCE MITCHELL, | |
| Defendant. | |

## MEMORANDUM IN AID OF SENTENCING

Landon Mitchell will be before the Court for sentencing on March 3, 2022, having accepted full responsibility for his conduct at the U.S. Capitol on January 6. Mr. Mitchell has admitted that he had no business going inside the building and into the Senate chamber and that it was wrong to think—no matter what political leaders had said—that delaying the vote certification was justified because of purported election fraud. Beyond the events of January 6, Mr. Mitchell also acknowledges that he struggles with a long-standing substance abuse disorder that he must address in order to be the man that he strives to be. He comes before the Court prepared to accept the consequences of his actions and to accept drug treatment should the Court order it as a condition of supervision.

Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG"), Mr. Mitchell states that he has reviewed the Pre-Sentence Report (PSR)

and offers one objection to the PSR, namely, that the PSR wrongly assesses a 3-level increase under § 2J1.2(b)(2) for substantial interference with the administration of justice.[1] For the reasons set forth by the Honorable Judge McFadden in *United States v. Seefried*, Mr. Mitchell contends that § 2J1.2(b)(2) does not apply as a legal matter because the certification of the vote does not qualify as "administration of justice." Therefore, the defense submits that the correctly calculated guideline range is 21 to 27 months.[2] For the reasons that follow, Mr. Mitchell submits that a sentence of 18 months followed by supervised release to include a condition of intensive drug treatment is sufficient but not greater than necessary to achieve the goals of sentencing.

## I.      Procedural History

On October 20, 2021, FBI agents arrested Mr. Mitchell outside the homeless shelter in Arlington, VA where he was staying and brought him to the FBI building in Washington, D.C. where agents conducted an interview. Mr. Mitchell immediately waived his rights and answered the agents' questions. Mr. Mitchell admitted to climbing the scaffolding outside the Capitol, entering the Capitol building, and entering the Senate chamber. Mr. Mitchell was charged in a six count Criminal Complaint on October 19, 2021: Obstruction of an Official Proceeding and Aiding and Abetting under 18 U.S.C. § 1512(c)(2) (Count One); Entering and Remaining in a

---

[1] Mr. Mitchell also renews an objection to a factual error in the Final PSR.

[2] Mr. Mitchell does not dispute that he is in criminal history category IV and that 2J1.2 is the applicable guideline. Under 2J1.2, the base offense level is 14, resulting in an overall offense level of 12 after adjustment for acceptance of responsibility.

Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Three); Entering and Remaining on the Floor of Either House of Congress under 40 U.S.C. § 5104(e)(2)(A) (Count Four); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Six). The grand jury indicted Mr. Mitchell with the same six counts on December 8, 2021. Mr. Mitchell's case was joined with co-defendant, Luke Wessley Bender, on May 24, 2022. *See* 5/24/22 Minute Entry Order.

Mr. Mitchell was released pending trial and currently lives outside Houston, Texas with his brother and sister-in-law, who has submitted a letter to the Court. Mr. Mitchell struggles with drug addiction and is currently on home incarceration due to violations of his pretrial release conditions. The violations stemmed from his substance abuse disorder.

Mr. Mitchell has consistently expressed his desire to enter a guilty plea to some of the counts of the indictment, but the government opposed defense counsel's proposed resolution. Like many other January 6 defendants, he wished to preserve his right to the application of 18 U.S.C. § 1512 to his conduct.[3] Accordingly, the

---

[3] As the Court is well aware, the Honorable Judge Nichols held that conduct like Mr. Mitchell's on January 6 cannot qualify as conduct that "otherwise obstructs, influences, or impedes" an official proceeding, within the meaning of Section 1512(c)(2) because it did not involve the destruction of evidence or documents. The government has appealed Judge Nichols's opinion in *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022).

government offered a stipulated trial agreement whereby Mr. Mitchell accepted responsibility for the conduct set forth in the statement of offense. The Court found Mr. Mitchell guilty on all counts of the Indictment at the December 7, 2022 stipulated facts trial. *See* 12/7/22 Minute Entry. Following his conviction, Mr. Mitchell cooperated with Probation in the Pre-Sentence Interview process.

## II.  Objection to PSR: The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense characteristic.

As set forth in Mr. Mitchell's objections to the Pre-Sentence Report ("PSR"), Dkt. 106, Mr. Mitchell objects to the application of the three-level enhancement for interference with the administration of justice under U.S.S.G. § 2J1.2(b)(2). Mr. Mitchell incorporates by reference that argument here.

The applicable guidelines range, if the Court applies the three-level enhancement under § 2J1.2(b)(2) is 27-33 months. The applicable guidelines range without the enhancement under § 2J1.2(b)(2) is 21-27 months.

Mr. Mitchell also renews his objection to the date of the offense listed in paragraph 90. This arrest did not occur in 1998, when Mr. Mitchell was 7 years old. When Mr. Mitchell was 7 years old, his family lived in Minnesota, not Virginia. Also, the details regarding the arrest list court dates in 2008 and 2009. The date should be changed to 10/09/2008.

4

### III.     Application of the Sentencing Factors

### A. Mr. Mitchell's history and characteristics show that a sentence that accounts for his past trauma and provides drug treatment is warranted.

Mr. Mitchell's admitted struggles of late cannot be considered in a vacuum. In speaking with him, it quickly becomes apparent that he is grappling with the fallout of a turbulent youth. This is not to say that he blames his upbringing for his legal troubles and his substance abuse disorder, which are inextricably linked. Mr. Mitchell blames no one but himself, and he is grateful for the continuing support of his mother and brother. That said, there is no question that a childhood and adolescence marred by untreated trauma played a significant role in Mr. Mitchell's path to this troubling point: facing sentencing for a federal charge and on supervision for unrelated state charges.

#### i. *Mr. Mitchell's childhood and adolescence were marked by significant child abuse and instability.*

Landon Mitchell was born in 1990 in Oklahoma. His father is a member of the Wichita Tribe. As a descendant of a tribe member, Landon is also a member of the Wichita Tribe. His parents were together when he was born, but divorced when he was two years old. His father was not a presence in his life until he was a teenager. His mother, a military service member, moved Landon and his younger brother, Luke, around a lot when the boys were young. After she divorced Landon's father, his mother married and divorced two men, one of whom who viciously beat Landon and his mother.

When Landon was a baby, he and his mother and brother moved to North Little Rock, Arkansas, and moved in with his mother's boyfriend at the time. Landon does not have many memories of that time but does remember that his mother's relationship with her then-boyfriend was volatile and the house was unsuitable for children. One of his first memories is of rats coming out of the toilets.

When Landon was in in first grade, his mother moved the boys to Cabot, Minnesota, where his mother met and married a man named Mark. Mark was abusive. He beat Landon and his mother for the five years that they were married. The abuse was incessant and ranged from daily ostensibly playful "smacks upside the head" to vicious assaults. Under the guise of roughhousing, Mark would smack Landon in the head every day. To young Landon, the daily smacks hurt and he flinched with fear every time that Mark walked into a room. Sometimes, the abuse would be more extreme. For example, one day when he was about 7 years old, Landon forgot to change the cat's litter box as he was supposed to do. Mark flew into a rage, picked Landon up by the ears, and threw him into the refrigerator. Another time, when Landon and his stepbrother ordered a video on "pay per view" without permission, Mark hit Landon so hard he left an open gash on Landon's forehead. Another time, Mark "choke slammed" Landon's mother through a table. Landon never received therapy to process this early child abuse and it has undoubtedly affected him in myriad ways. Landon reported to undersigned counsel that because of the constant abuse, he was always scared and timid around other kids. This made him a target for bullying, made worse because he was often the new kid in school.

6

Later, he used drugs and alcohol to quiet his feelings of fear and paranoia. Studies show that Landon is not alone in turning to alcohol and drugs to cope with childhood abuse. Research shows that childhood abuse increases the risk of substance abuse later in life.[4]

### ii. Abuse continued at the now-shuttered Excel Academy.

When Landon was ten years old, his mother left Mark and moved the boys to Huntsville, Alabama. After a few years in Alabama, Landon's mother and the boys moved to Montgomery, Texas, where Landon's mother's family is based. By this time, Landon was reaching adolescence and starting to act out. When he was 12 years old,

---

[4] Adverse Childhood Experiences (ACEs) such as emotional abuse and physical abuse can lead to lasting negative health outcomes for adults if left untreated. These negative health outcomes can include: substance misuse, alcoholism, smoking, chronic health conditions, depression, and others. *We Can Prevent Childhood Adversity: The Science of Adverse Childhood Experiences (ACEs) Shows We Can Improve People's Lives and Help Them Thrive*, Centers for Disease Control and Prevention, (Feb. 2023) https://vetoviolence.cdc.gov/apps/aces-infographic/home; *see also* Vincent J. Felitti et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study*, 14 Am. J. of Preventive Med. 245 (1998) (Adverse Childhood Experiences original study that found the linking factor between adverse childhood experiences, health risk behaviors, and adult diseases "appear to center on behaviors such as smoking, alcohol or drug abuse . . . that may be consciously or unconsciously used because they have immediate pharmacological or psychological benefit as coping devices in the face of the stress of abuse, domestic violence, or other forms of family and household dysfunction."); Dante Cicchetti & Elizabeth D. Handley, *Child maltreatment and the development of substance use and disorder*, 10 Neurobiology of Stress 1 (2019); Michael Kaliszewski, *The Link Between Child Abuse and Substance Abuse*, American Addiction Centers, (Feb. 2023) https://americanaddictioncenters.org/blog/the-link-between-child-abuse-and-substance-abuse ("Several epidemiological studies have shown that experiencing abuse as a child increases the risk for substance abuse later in life."); Kathleen Kendall-Tackett, *The health effects of childhood abuse: four pathways by which abuse can influence health*, 26 Child Abuse & Neglect 715 (2002).

his mother sent him to Excel Academy, a private school marketed as a therapeutic boarding school, but ultimately closed following allegations of abuse by staff.[5] By this time, Landon had been diagnosed with ADHD and he was experiencing symptoms of severe depression. Landon's mother was hopeful that the Excel Academy would provide the therapy and services that Landon needed. Unfortunately, his experience at Excel Academy only exacerbated his mental health issues and contrary to providing therapy for past abuse, the school inflicted more trauma on young Landon.

Landon was one of the youngest boys at Excel. He was bullied by the students and the staff did not do anything to stop it. Instead, it seemed to Landon that the staff were encouraging the bullying. The school had a discipline-oriented boot camp approach without the counseling and nurturing that the at-risk children needed to thrive. Case in point, the children were forced to wear orange jump suits and flip flops, a notorious practice that was suspended in 2007.[6] Reportedly, the "disciplinary tactics" included forcing students to do hard labor in the hot sun for hours or stand in pools brimming with ice water all night long. The tactics were so traumatizing that

---

[5] Excel students were forced to wear orange jumpsuits and take frequent tours of the local jail. A few months before the school closed, one student was attacked while on one of these jail tours. An excel staff member, Monte Morast, pleaded guilty to official oppression and unlawful restraint of a child following the attack. Cardenas, Lucretia, *Ex-Officer sentenced to official oppression*, The Courier of Montgomery County (April 26, 2009) https://www.yourconroenews.com/neighborhood/moco/news/article/Ex-officer-sentenced-for-official-oppression-9250851.php.

[6] *See* Hicks, Tyler, A new podcast dives into the world of painful abuse at a Texas boarding school, Dallas Observer (April 5, 2001) https://www.dallasobserver.com/arts/radio-personality-tc-fleming-launches-podcast-about-abusive-texas-boarding-school-12002183.

former students of the school have started a podcast to share their stories of the "painful abuse" inflicted on them at Excel Academy.[7]

Landon left Excel when he was 14 years old because his mother could no longer afford the tuition. While he had been at Excel, his mother and Luke had moved to Kansas. Landon moved from Excel Academy to Kansas to join his mother and brother. Not surprisingly given his experience at Excel, Landon's reunion with his mother and brother was not smooth and he continued to act out. After only a few months, he went to live with his then-estranged father and stepmother in Oklahoma.

### iii. Landon's painful reunion with his estranged father

When Landon showed up at his father's home at age 15, it was the first time he had seen his father since he was two years old. He had spent his childhood and adolescence imagining the kind of idealized father he had seen television shows. He had fantasized about his dad teaching him how to ride a bike, how to catch a baseball, taking him fishing—activities that he imagined a father would do with a boy and which his mother did not have time for. He came full of hope that his father would welcome him with open arms. Landon was crushed when his reunification with his father was the opposite of what he had dreamed about. His father was cold and distant, his stepmother stern and strict. Unbeknownst to Landon, the couple had adopted seven Native American children. Just a teenager, Landon did not appreciate the sacrifice his father and stepmother made to bring the children into their home. To Landon, the home was cramped and chaotic. A gangly 15-year-old amidst several

---

[7] *Id.*

younger children, he felt out of place and unwanted. After one difficult year with his father, Landon moved to Virginia, to live with this mother, who had by then recently relocated to northern Virginia for her work with the military.

### iv. Landon's struggles with substance abuse disorder and resulting involvement with the criminal legal system.

Landon returned to his mother's home older and more hostile and unmoored than he was when he left. He began using alcohol every day to numb his feelings. Soon heavy drinking blossomed into recreational drug use. Not surprisingly, involvement in the criminal legal system followed. When he was 18, he was involved in an altercation and because the group made references to the Blood gang, he was convicted for criminal street gang participation in Fairfax County Court. Mr. Mitchell was never a member of any gang. But when he was younger, he thought it would make him sound tougher and more intimidating if he claimed he was part of a gang. When Mr. Mitchell was 20, he was convicted of burglary after he broke into a friend's neighbor's apartment, took food and clothes and watched movies. He later admitted that he committed the offense because he was homeless and hungry. After serving approximately four years for the burglary, Mr. Mitchell was released with nowhere to go. Though his mother had moved back to Texas while Mr. Mitchell was incarcerated, Mr. Mitchell stayed in Virginia because he was under supervision by the state court. Without family to support him, Mr. Mitchell became itinerant, mostly living in homeless shelters and occasionally with friends. During the two years prior to January 6, 2021, Mr. Mitchell lived in a homeless shelter. It was during this time

that he became addicted to methamphetamines because in his mind, the drug helped him get through the day.

### v. Mr. Mitchell's support of President Trump leading up to January 2021.

Mr. Mitchell had never paid attention to politics prior to Mr. Trump's 2016 presidential campaign. Prior to Mr. Trump, he felt that politicians were wealthy, educated people who did not care about people like him. Mr. Trump immediately caught Mr. Mitchell's attention when he exploded onto the scene in 2015. Mr. Mitchell appreciated his plain way of speaking and tough bravado. He felt that Mr. Trump cared about working class people like himself. Mr. Mitchell followed the election of 2020 with great interest. When Mr. Trump and other prominent people in his orbit began spreading news about rampant election fraud, Mr. Mitchell believed it. After all, he did not trust any politician before President Trump. Online, he found what he believed then to be evidence of the election fraud that the President had been talking about. On Facebook, for example, he saw articles by what he believed to be reputable organizations detailing election fraud.[8] Soon, he, like the millions of Americans who fell for Mr. Trump's lies, believed that the election had been "stolen."

### B. The nature and circumstances of Mr. Mitchell's offense warrant a sentence of 18 months.

Unfortunately, in the lead-up to the election Mr. Mitchell did not question the posts and purported "news" he encountered on Facebook and his support of Mr.

---

[8] A Pro Publica-Post investigation, which analyzed millions of posts between Election Day and Jan. 6 and drew on internal company documents and interviews with former employees, demonstrated that Facebook played a critical role in the spread of false narratives that fomented the violence of Jan. 6. *See* Silverman, Craig, *Facebook*

Trump soon became what Mr. Mitchell has described as "unconditional." He has since realized that not everything he sees online is true. Prior to the election, Mr. Mitchell regularly shared and liked posts and articles about Mr. Trump on Facebook during his presidency. Mr. Mitchell lived in northern Virginia for most of President Trump's term and occasionally attended rallies to support President Trump.

After the presidential election, former President Trump, members of his inner circle and some members of the media began circulating the word that the election was "stolen." The false claims spread on media—from local news outlets, to Facebook, to some national broadcasts—that the election had been corrupted.[9] Mr. Mitchell

---

*groups topped 10,000 daily attacks on election before Jan. 6, analysis shows*, Washington Post, (January 4, 2022) https://www.washingtonpost.com/technology/ 2022/01/04/facebook-election-misinformation-capitol-riot/; Merrill, Jeremy B., *How ProPublica and The Post researched posts of Facebook groups*, Washington Post, (Jan.y 4, 2022) https://www.washingtonpost.com/technology/2022/01/04/facebook-propublica-post-jan6-methodology/.

[9] The false claims spread on media—from local news outlets, to social media, to some national broadcasts, that the election had been corrupted. For example, one news source stated that Texans should be wary of voting by mail in the 2020 election because mail in ballots are "ripe for fraud and abuse." Robert Montoya, *Are Texas Elections Secure?*, Texas Scorecard (Nov. 6, 2020), https://texasscorecard.com/ state/are-texas-elections-secure/. See, eg., Tucker Higgins & Kevin Breuninger, *Texas sues for battleground states in Supreme Court over 'unlawful election results' in 2020 presidential race*, CNBC (Dec. 9, 2020), https://www.cnbc.com/texas-sues-four-battleground-states-in-supreme-court-over-unlawful-election-results.html (reporting on Texas lawsuit filed after the 2020 election which argued that the election results in Pennsylvania, Georgia, Wisconsin, and Michigan . . . should be declared unconstitutional based on the states' use of the COVID pandemic to change their election outcomes); Donald Trump (@realDonaldTrump), *Twitter*, (Dec. 9, 2020, 8:39 AM), https://twitter.com/realDonaldTrump/status/trump-tweets-his-campaign-will-join-paxsons-election-suit (Mr. Trump tweeted in support of the above Texas lawsuit contesting the election results in battleground states, stating that the lawsuit was "very strong, [with] ALL CRITERIA MET. How can you have a presidency when a vast majority think the election was RIGGED?"); Kate McGee, Texas *Republicans decline to condemn President Trump's premature declaration of victory while votes are*

believed—because of what the President and other prominent politicians and media figures were saying—that the democratic process had been undermined by fraud.[10] When President Trump started advertising the "Stop the Steal" rally, Mr. Mitchell decided to attend to protest the election. Mr. Mitchell hoped that a protest would cause Congress to listen to the American people and reconsider certifying the election. Mr. Mitchell posted on social media that he intended to go to the rally and shared his belief that the election had been stolen.

Mr. Mitchell became caught up on the rhetoric and accusations flowing through Facebook and other social media and reposted or commented on articles and memes that discussed seceding from the United States and referenced "civil war." These posts must be understood for what they are–reposts of articles and memes created by other individuals that were reposted and shared by hundreds, even

---

*still being counted*, The Texas Tribune (Nov. 4, 2020), https://www.texastribune.org/texas-republicans-trump/ (reporting how many Texas republicans, including Senator Ted Cruz, Senator John Cornyn, and Governor Greg Abbott, were silent on the matter of "Donald Trump prematurely and falsely [declaring victory]" in the 2020 election and U.S. Rep. Jodey Arrington stating that "there are legitimate concerns regarding the potential for fraud [in the election] that must be addressed in order for the country to move forward").

[10] At least one district judge has recognized that the false claims of a "stolen election" spread by prominent and trusted leaders can be a mitigating factor in some January 6 cases. In sentencing another defendant to probation for entering the Capitol, the Honorable Amit P. Mehta stated:

> It really does, in my mind, go to the power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from the people when it wasn't. . . people were told over and over again something that was not true, so much so that people like [the defendant] lost his way."

*United States v. Cavanaugh*, 21CR362, Sentencing Tr. p. 29 (sentencing defendant to 24 months' probation for entering the Capitol building).

thousands, of other individuals. Mr. Mitchell was not creating unique content or individually planning actions to take place on January 6. Mr. Mitchell regrets those posts and that he allowed himself to be swept up into the discourse that was spreading on Facebook and other online forums prior to January 6. When he traveled to the "Stop the Steal" rally, he intended to protest the election and support Mr. Trump. While the events that unfolded on January 6 have been labeled "an insurrection," Mr. Mitchell did not attend the rally intent on overturning the government. To the contrary, he felt it was his patriotic duty as an American to support the President and to speak out—in the form of peaceful protest—against election fraud.

Mr. Mitchell attended the "Stop the Steal" rally with his friend, Mr. Bender.[11] On January 6th, they took the metro from northern Virginia into Washington, D.C. Mr. Mitchell wore a red Trump hat and carried a white Trump 2020 flag. The rally was exciting and the crowd was very energetic. Mr. Mitchell heard President Trump's speech and the call to meet him at the Capitol. After the rally, Mr. Mitchell followed the crowd to the Capitol where he believed they were going to continue to protest.

Before Mr. Mitchell reached the Capitol, he heard from others in the crowd that the members of Congress had already left the building.[12] At the Capitol, Mr.

---

[11] Mr. Bender used to work with Mr. Mitchell at Mosquito Joe's. Prior to January 6, Mr. Mitchell knew Mr. Bender for a couple of years. They had attended other Trump rallies together previously.

[12] The Statement of Facts for Stipulated Trial, Dkt. 95, states that members of Congress evacuated at approximately 2:20 p.m. on January 6. *Id.* ¶ 7. The stipulated statement of facts goes on to state that Mr. Mitchell did not enter the Capitol until approximately 2:45 p.m. *Id.* ¶ 19.

Mitchell witnessed individuals he thought were Proud Boys shouting about "going in" the Capitol. Mr. Mitchell is not and has never been a member of the Proud Boys or any other similar group. Mr. Mitchell followed other individuals toward the west façade of the Capitol where the scaffolding was being erected for the inauguration. Mr. Mitchell was excited by the energy of the crowd and, when he saw people climbing the scaffolding, he joined them. He climbed to the top of the scaffolding, where he took a video. Afterwards, he continued to follow the crowd, which led him to the Upper West Terrace Door.  When Mr. Mitchell arrived at the door, it was already open and the crowd was moving inside the building.

Mr. Mitchell entered the building and moved with the crowd through the Rotunda, down the East Front Corridor, through the Ohio Clock Tower Corridor, down a hall, and into the Senate chamber. Mr. Mitchell did not engage with any officers as he followed the crowd through the Capitol and did not steal or vandalize any object within the Capitol. He did not wear combat gear or carry any weapons. Mr. Mitchell was in the Senate chamber for approximately four minutes, during which time he took photos and looked at documents on tables. He did not take any documents, did not write on any documents, did not destroy any documents, and did not otherwise alter any documents. Importantly, he entered the Senate Chamber *after* he learned that the Senators had been evacuated. Therefore, there can be no argument that he entered the chamber with the intent to threaten or intimidate the Senators.

Mr. Mitchell left the Senate chamber and the Capitol building when officers directed him to exit. He was inside the Capitol for approximately 25 minutes. He did not break anything, steal anything, deface anything, or otherwise cause any damage. He did not engage with officers and took part in no violence. As soon as Mr. Mitchell left the building, he took the metro back to northern Virginia. He did not stay in D.C. during the curfew or continue to protest.

Mr. Mitchell acknowledges that after he left the Capitol, he sent messages to family and friends on Facebook that stated he took part in the protest at the Capitol. Although the statement says that he "pushed back the police and breached the doors," there is no evidence that Mr. Mitchell pushed officers or breached any doors. Mr. Mitchell's statements were exaggerations of his own actions.

### i. *Mr. Mitchell's acceptance of responsibility.*

Since his arrest, Mr. Mitchell has thought critically about the events of January 6, 2021, his actions, and the words and incitements that ultimately led to him marching to and entering the Capitol on that day. Mr. Mitchell recognizes that he did not question statements made by Mr. Trump, statements in the media supporting Mr. Trump, or any of the targeted media that he was engaging with on Facebook and other online forums. He believed Mr. Trump's statements and trusted that his actions were in the best interest of the country. Mr. Mitchell now understands that he needs to be more critical of the media he reads and he is careful not to be "caught up in the hype." He genuinely regrets the things he reported and said on social media and his actions on January 6.

In late 2020 and early 2021, Mr. Mitchell was still an ardent Trump supporter and his words and actions reflect those strongly held opinions. Looking back on the things he posted on social media and the actions he took on January 6, Mr. Mitchell regrets the choices he made. He recognizes they were his choices and he could, and should, have decided differently. Mr. Mitchell entered into the stipulated facts trial on December 7, 2022 to accept responsibility for these actions.

Mr. Mitchell's acceptance of responsibility began on the date of his arrest, October 20, 2021, when he waived his right to counsel and participated in an interview with FBI agents. Mr. Mitchell provided honest answers about his actions on January 6, 2021. While he was hesitant to identify Mr. Bender as the individual he attended the rally with, he otherwise fully complied with their questions and admitted to his actions. He admitted to climbing the scaffolding and entering the Capitol and Senate chamber on January 6. He identified himself in photographs and described other actions he observed while in the building, including people taking pens from the Senate chamber and an individual attempting to break a window, which Mr. Mitchell stopped.

### C. A sentence of time-served followed by supervision will achieve the goals of sentencing.

#### i. A sentence of 18 months will avoid unwarranted disparities.

The defense here provides examples of cases involving other defendants who engaged in conduct comparable to Mr. Mitchell's. Specifically, individuals who entered the Capitol, walked into the Senate chamber, and went to the dais.

17

*United States v. Paul Hodgkins, No. 21-cr-188 (RDM)*



**Mr. Hodgkins at the dais with Mr. Moynihan behind him**

Mr. Hodgkins took rope, protective eye goggles, and latex gloves into the Capitol. Once inside the Capitol, he put on his eye goggles and entered the Senate chamber. He walked to the well and stood at the dais with a flag in hand. He was seen in the well of the Senate taking photographs and putting on latex gloves. ECF No. 1. Mr. Hodgkins was convicted of the same felony offense as Mr. Mitchell, 18 U.S.C. § 1512, and was sentenced to 8 months' incarceration. The government may try to distinguish Mr. Mitchell by noting that Mr. Hodgkins had no criminal record. First, Mr. Mitchell's criminal record is a result of his substance abuse problems and homelessness. Second, to the extent there is a difference in the two defendants' backgrounds, a sentence of 18 months for Mr. Mitchell would account for that.

*United States v. Christine Priola, No. 22-cr-242 (TSC)*


**Ms. Priola at the dais**

Ms. Priola carried a large sign reading "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other.  Once she had entered through the Rotunda door, Ms. Priola held her sign to a window, knocked on the glass and gestured to the crowd below.  She then made her way to the Senate chamber, where she made telephone calls, including to an associate who was outside the building, to whom she said: "Everybody has to get in here now.  This is now or never."  ECF No. 56.  While on the Senate floor she took photographs and video and stood next to the dais of the Senate.  She then deleted data from her phone for the period from January 4 through 7, 2021. Ms. Priola was convicted of the same felony offense as Mr. Moynihan, 18 U.S.C. § 1512, and was sentenced to 15 months' incarceration by Judge Chutkan.

*United States v. Tommy Allan, No. 21-cr-64 (CKK)*



After climbing a rope up the side of the Capitol, Mr. Allan entered the building though a fire door next to the Senate Parliamentarian's office, which had been broken open by rioters. He entered the Parliamentarian's office and then walked through the halls of the

**Mr. Allan at the dais**

Capitol for approximately 15 minutes, during which time he stole an American flag. He joined a group of rioters confronting Capitol Police officers near the North Door and put himself at the front line. When rioters pushed through this police line, he climbed up a flight of stairs and entered the Senate chamber. While inside, he stood on the dais as fellow rioters chanted slogans, and stole paperwork from the front desk as well as the desk of Senate Majority leader Mitch McConnell. After Capitol Police forced rioters out of the Senate chamber, Allan was made to give up his flag and escorted out of the building. Allan held up his stolen papers like a trophy to the crowd outside, and then crossed the street and bragged on a Facebook live stream about his exploits, claiming that he scaled a wall to get into the Capitol, and proudly displaying the stolen documents. When he returned home, Allan deleted his Facebook account and destroyed the documents he had stolen in an effort to hide the evidence of his unlawful conduct. Allan declined to be interviewed by law enforcement officers when

they visited his home a week later. The next day Allan got rid of his cellphone because it contained evidence of his participation in the attack.  Mr. Allan was convicted of theft of government property as well as 18 U.S.C. § 1512 and was sentenced to 21 months incarceration by Judge Kollar-Kotelly.  Mr. Mitchell did not climb a rope up a wall of the Capitol.  He did not steal an American flag.  He did not steal papers from the Senate chamber and display them to a crowd nor did he livestream his actions to an audience.  His conduct was far less serious than Mr. Allan and his sentence should reflect that fact.

### ii. 18 months is more than sufficient to protect the public from further crimes by Mr. Mitchell.

The requested sentence will be sufficient to protect the public from further crimes of Mr. Mitchell and provide specific deterrence. While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.

Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions").

In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016). This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences." Austin, Brennan Ctr., *supra*, at 35. Some studies have concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher recidivism. *Id*. Similarly, a 2002 Justice Department study "found that recidivism rates did not differ significantly among those released after serving 6 months or less compared to those serving sentences all the way up to 30 months in prison." *Id*. at 36.

Mr. Mitchell has worked hard since he moved to Texas in June 2022 to try to get himself back on track. He found work with a pesticide company, Mosquito Authority, using the certificate he got in Virginia when he worked with Mosquito Joe's. This arrest and conviction has provided Mr. Mitchell with the opportunity to reconnect with his mother and brother, who live in Texas and who are positive features in his life. Upon his release, he intends to return to Texas and rebuild his life near his mother and brother.

Finally, there is no argument that Mr. Mitchell *generally* presents a threat to the public, beyond the isolated events of January 6. While the events of January 6 were unique and hopefully never to be replicated, even if the former President were

to invite his supporters to a campaign rally in the future, Mr. Mitchell would have no desire to attend. His brief foray into political engagement started with President Trump and ended after his arrest in October 2021. Because he is not a *general* threat to the public—to the contrary, he has managed to maintain relatively consistent employment on release—prison is not necessary to protect the public from further crimes of Mr. Mitchell. Instead, the community will be better off if Mr. Mitchell returns quickly to society to rebuild his relationship with his family, receive treatment, and continue his consistent employment.

### iii. An 18-month sentence and release to CNC halfway house will provided the needed training and treatment.

As the Court is aware, Mr. Mitchell suffers from an addiction to methamphetamines. He has been using meth since he was in his mid-20s and, even with treatment, he continues to struggle to remain clean. But Mr. Mitchell has not given up trying to get clean. After his release from custody in Texas in January, he went with his mother to talk to Tony Vanderbur, the Executive Director at the Christian New Creation ("CNC") halfway house outside of Houston, Texas. Mr. Vanderbur informed counsel that whenever Mr. Mitchell is released from custody there will be a bed available for him at CNC. CNC is a faith-based, nonprofit, transitional living facility that focuses on individuals coming out of Texas prisons. CNC is a secure facility that provides services to the residents including, religious and bible study programs, employment counseling, mentoring, alcohol and narcotics counseling, and other services.

Incarceration will not provide Mr. Mitchell with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," which is a factor to consider under 3553(a)(2)(D). Although some BOP facilities have classes and drug counseling available to residents, prison does not traditionally serve a rehabilitative purpose. Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Community-based sanctions provide better opportunities for rehabilitation. CNC's mission is to provide services and counseling to its residents and CNC is prepared to offer Mr. Mitchell a bed when he is released from BOP custody.

A sentence of 18 months followed by drug treatment and other services such as the CNC halfway house is sufficient, but not greater than necessary, to satisfy the purposes of punishment. Placement at CNC following his release will provide Mr. Mitchell with the appropriate counseling and services to reintegrate Mr. Mitchell into society and set him up for a successful future.

## CONCLUSION

For the foregoing reasons and such others as may be presented at the sentencing hearing, Mr. Mitchell respectfully requests that the Court impose a sentence of 18 months. Mr. Mitchell agrees with the PSR's assessment that he is not in a position to pay a fine.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Elizabeth Mullin
Assistant Federal Public Defender
Diane Shrewsbury
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500